Argued and submitted May 9, reversed August 28, petition for review denied December 3, 2002 (335 Or 104)

In the Matter of the Compensation of
Dennis M. Getz, Claimant.

Dennis M. GETZ,
*Petitioner,*

*v.*

WONDER BUR
and Liberty Northwest Insurance Corporation,
*Respondents.*

97-00652; A114152

52 P3d 1097

Richard D. Adams argued the cause for petitioner. With him on the briefs was Myrick, Seagraves, Adams & Davis.

David O. Wilson argued the cause and filed the brief for respondents.

Before Landau, Presiding Judge, and Brewer and Schuman, Judges.

SCHUMAN, J.

## SCHUMAN, J.

If a worker sustains a compensable injury and subsequently, as part of the claim closure and evaluation process, his physician orders an examination to determine the worker's residual capacity, and, during that exam, the worker sustains a second injury, is the second injury itself compensable? In this case, the Workers' Compensation Board (board) held that it was not, and claimant seeks judicial review. Because the material facts are not in dispute, we review only for errors of law. ORS 656.298(7); ORS 183.482(8). We reverse.

Claimant worked for employer as a bartender. In 1993, he compensably injured his shoulder while attempting to eject a customer. After several surgeries, the last in December 1995, his treating physician, Dr. Chamberlain, released him to modified work. In March 1996, Chamberlain found claimant to be medically stationary and released him to regular work. Before claim closure, Chamberlain requested that claimant undergo a "physical capacity evaluation" (PCE) to determine the degree, if any, of his disability. At that evaluation, while performing one of the diagnostic tasks (a "lunge movement"), claimant injured his left hip. Chamberlain took x-rays, diagnosed left hip tendinitis, and released claimant to regular work. Claimant sought compensation for the hip injury, and employer's insurer denied the claim. An administrative law judge and the board upheld the denial. This petition for judicial review followed.

To decide this case we must apply ORS 656.005(7)(a), the definition of "compensable injury," which provides, in part:

> "A 'compensable injury' is an accidental injury * * * arising out of and in the course of employment * * * subject to the following limitations:

> "(A) No injury or disease is compensable as a consequence of a compensable injury unless the compensable injury is the major contributing cause of the consequential condition."

As interpreted by the Supreme Court in *Robinson v. Nabisco, Inc.*, 331 Or 178, 184-85, 11 P3d 1286 (2000), this statute distinguishes accidental injuries, which arise directly out of and in the course of employment, from consequential conditions, which do not. The former injuries are compensable *per se*, while the latter conditions are compensable only if a prior compensable injury is the consequential condition's major contributing cause. In determining that an injury incurred during a "compelled medical exam" (CME)[1] is compensable, the *Robinson* court treated that injury as falling within the first category and focused on whether such an injury arose out of and in the course of employment, without applying a "major contributing cause" analysis. *Id.* at 190. We apply the same analysis to this injury sustained during a PCE.

■ Compensability under *Robinson* depends on a "unitary 'work-connection' inquiry that asks whether the relationship between the injury and the employment is sufficiently close that the injury should be compensable." *Id.* at 185. That inquiry, in turn, consists of two "prongs": The injury must "arise out of" the employment, which requires "some causal link," *id.* at 186, and it must occur "in the course" of the employment, which " 'point[s] to the time, place and circumstance under which the accident takes place,' " *id.* at 188 (quoting *Larsen v. State Ind. Acc. Com.*, 135 Or 137, 139-40, 295 P 195 (1931)). To qualify as compensable, the injury must meet both "prongs," but "if many facts support one element * * *, fewer facts may support the other." *Id.* at 186.

*Robinson* not only establishes the analytical framework for deciding compensability, it also provides a useful touchstone for applying that analysis here; *Robinson* evaluates the work connection of a CME, which, like a PCE, is a part of the claims process involving a medical evaluation, off

---

[1] Generally, claimants' attorneys refer to a "compelled medical examination," or CME, while insurers' and employers' attorneys refer to an "independent medical examination," or IME. The title of ORS 656.325 uses the term "required medical examination," and in OAR 436-010-0265 the acronym IME stands for "insurer medical examination." Our usage has not been consistent. *Compare Wantowski v. Crown Cork & Seal*, 175 Or App 609, 612, 29 P3d 1165 (2001) (CME), *with Seeley v. Sisters of Providence*, 179 Or App 723, 725, 41 P3d 1093 (2002) (IME, standing for "independent medical examination"). In this case, we use CME because that is what the Supreme Court used in *Robinson*.

the work site, but in some sense related to the compensable injury. Indeed, the outcome of this case depends on the degree of similarity between a CME and a PCE. We therefore summarize what each is and the role it plays in the workers' compensation statutory scheme.

The Supreme Court describes the CME as follows:

"ORS 656.325(1) entitles only three persons or entities to request a CME: the Director of the Department of Consumer and Business Services, an insurer, and a self-insured employer. Only one person is subject to the duty to submit to a CME: a worker entitled to receive compensation. The predicate for any CME is a work-related injury or disease that entitles the worker to receive compensation. Thus, it is a condition of the employment relationship—specifically, an injury or disease that occurs on the job—that gives rise to the respective rights and duties of the parties described in ORS 656.325(1).

"The injured worker must comply with a request for a CME or face suspension of the right to compensation. In no sense is the worker's participation in a CME a voluntary act carried out for personal reasons.

"ORS 656.325(1) does not state explicitly the purpose of a CME but, in context, the purpose is clear. A CME is designed to provide the director, the self-insured employer, or the employer's insurer with information about claimant's condition from a doctor who has no fiduciary relationship with claimant, such as that of an attending physician. * * * An employer or insurer that requests a CME, as in this case, might use the examining doctor's information to protect the employer's legal position on the claim *vis-à-vis* the claimant, for example, by challenging the continuing compensability of the injury or disease, the extent of any resulting disability, or the nature of medical or psychological treatment that the claimant may require.

"ORS 656.325(1)(b) obligates the employer's insurer or a self-insured employer to pay the costs of a CME. * * *

"The statute gives claimants no role in selecting the person who performs the CME but, by implication, leaves that matter to the person or entity that requests the examination."

*Robinson,* 331 Or at 186-87.

Unlike the CME, the PCE has no explicit statutory source. Its nature and function derive from administrative rules. OAR 436-010-0005 defines the procedure as "an objective, directly observed, measurement of a worker's ability to perform a variety of physical tasks combined with subjective analyses of abilities by worker and evaluator." More particularly, the kind of PCE claimant had in this case, testing more than one body part, is called a "second-level PCE." OAR 436-009-0070(4)(b). The exam occurs after a worker's attending physician determines that the worker is medically stationary but before the claim is closed. OAR 436-010-0280. Its purpose is "to measure general residual functional capacity to perform work or provide other general evaluation information * * *," and it may be requested by either the insurer or the claimant's attending physician. OAR 436-009-0070(4)(b). The information derived from the PCE is used by the attending physician, one of whose duties in reporting the results of a closing examination is to "specify the worker's residual functional capacity." OAR 436-010-0280(8). The closing examination, in turn, is used by the insurer to determine the extent of disability for purposes of closing the claim and calculating compensation. ORS 656.268(1)(a); OAR 436-030-0020. Where, as here, the worker has been released to regular work, the PCE need not occur if neither the attending physician nor the insurer requests it; in such cases, the attending physician may report on the claimant's residual functional capacity based on information from other sources. OAR 436-010-0280(8). The insurer pays for the PCE. OAR 436-009-0030(1).

This comparative overview of the CME and the PCE demonstrates that the procedures are similar, compelling the conclusion that, because an injury sustained during and caused by the former is compensable, so too is an injury sustained during and caused by the latter.

■ As discussed above, an injury is compensable if it arises out of and in the course of employment. In *Robinson*, the Supreme Court summarized those characteristics of a CME, which establish a causal link between an injury occurring there and a risk connected to a condition of employment, thereby meeting the "arising out of" prong of the work-connection test:

"Claimant's workplace injury was the event that exposed her to the possibility that employer might request a CME. In requesting a CME, employer was exercising a statutory right granted to it because of its status as an employer of a worker with a compensable injury. Claimant faced a loss of her compensation if she failed to submit to the examination. Employer bore the responsibility of paying claimant's costs connected to the examination, including, as appropriate, net lost wage reimbursement. Finally, the purpose of the examination was to aid employer in monitoring its continuing exposure to liability for a work-related injury. The examination was not an activity in which claimant chose to participate to serve her personal interests unconnected to her work."

331 Or at 188. Claimant's PCE shares most of those characteristics; to the extent there are differences, they are of degree and not of kind. The original 1993 compensable workplace injury exposed him to the possibility that he would be subjected to a PCE. The PCE occurred only because claimant was a worker with a compensable injury. Had claimant refused to participate, his employer could have sought a reduction in benefits. ORS 656.325(4). Employer paid for the examination. If the examination required more than four hours away from work, claimant received compensatory wages. ORS 656.210(4). Its purpose was to aid the employer in determining accurately the extent of its exposure, if any, for claimant's 1993 compensable injury. In sum, like the CME in *Robinson*, the PCE "was not an activity in which claimant chose to participate to serve [his] personal interests unconnected to [his] work." 331 Or at 188. We conclude that, like the CME in *Robinson*, a PCE such as the one in this case arises out of employment. It not only has "some causal link" to employment, *Krushwitz v. McDonald's Restaurants*, 323 Or 520, 525-26, 919 P2d 465 (1996), it has a sufficient causal link.

The "course of employment" aspect of the work-connection test "requires that the time, place, and circumstances of the employee's injury justify connecting that injury to the employment." *Id.* at 526. In *Robinson*, the Supreme Court identified several key characteristics of a CME that led to the conclusion that an injury sustained there is an injury

"in the course of employment." Those characteristics include "the fact that employer exercised control over claimant at the time of" injury in the sense that the employer chose the time, place, and circumstances of the medical evaluation; that the claimant did not attend the CME voluntarily, but at the direction of the employer; that the employer pays the claimant for the costs of attending the evaluation; and that the claimant participated in the evaluation for the benefit of the employer, notwithstanding that the claimant herself could derive a benefit from it as well. *Robinson*, 331 Or at 189. Summarizing, the court noted: "The proper focus is whether the activity promotes some interest of the employer. * * * [T]he CME in this case served the interest of employer by providing employer with pertinent information about claimant's compensable injury." *Id.*

■ As with the "arises out of" prong, the similarities between the CME and claimant's PCE with respect to the "in the course of" prong are more significant and pervasive than the differences. It is true that employer did not directly choose the time, place, and circumstances of the PCE. Neither, however, did claimant. The choice was made by his attending physician in pursuit of an objective that served to furnish employer with a detailed and accurate closing report that contained a specific statement of "the worker's residual functional capacity" as required by OAR 436-010-0280(8). In that sense, the physician ordered the PCE and chose the physical therapist who administered it more or less as an agent of employer. Claimant neither paid for the PCE nor attended it for his own purposes. The PCE, like a CME, was an integral part of the claim verification process. It occurred "within the period of employment [that is, at a time when claimant was on employer's payroll], at a place where a worker reasonably may be expected to be [that is, at a medical facility where he had been directed to go by his physician, as part of the claim evaluation process], while * * * reasonably * * * fulfilling the duties of the employment *or* * * * *doing something reasonably incidental to it." Fred Meyer, Inc. v. Hayes*, 325 Or 592, 598, 943 P2d 197 (1997) (emphasis added). The time, place, and circumstances of the PCE were therefore connected, albeit indirectly, to employer.

■ ■ Thus, the injury claimant sustained at his PCE meets both aspects of the work-connection test. It was causally linked to the compensable work-related injury, and it occurred in circumstances that justify connecting it to the employment. The causal link is strong; the connection between the injury's circumstances and employment, less so. Yet "[s]trong support for one prong and minimal support for the other may be sufficient to satisfy the test." *McTaggart v. Time Warner Cable,* 170 Or App 491, 494, 16 P3d 1154 (2000), *rev den* 331 Or 633 (2001). Ultimately, whether an injury meets the unitary work-connection test depends on the particular circumstances of the injury's occurrence. As the Supreme Court concluded in *Andrews v. Tektronix, Inc.,* 323 Or 154, 162, 915 P2d 972 (1996), the relevant inquiry is:

> "Considering all the pertinent circumstances, are the temporal, spatial, circumstantial, and causal connections between the claimant's injury and employment sufficient to justify compensation, when sufficiency is evaluated in the light of the Act's policy of providing financial protection to workers who are injured in the course of employment, regardless of fault?"

In this case, the answer to that inquiry is affirmative. Because the injury arose out of and in the course of employment, it is compensable, and the board erred in concluding otherwise.

Reversed.